The last case today, No. 241917, Berkey International, LLC v. U.S. Environmental Protection Agency, et al. Counsel for Appellant, please introduce yourself on the record to begin. I'm Warren Norad, Board Appellant, Berkey International. May it please the Court, opposing counsel, I first want to say thank you for sticking it out. I know that it's a tumultuous time in the federal government right now, and just being here is maybe a donation to the cause, I'm not sure, but we appreciate it. My client appreciates it very much, too. We're here on a denied temporary injunction following the oddest hearing I've ever had in my life. We had, because my client's principal is in his mid-70s, struggles with travel, and so we had agreed that he would appear initially by declaration and be available to answer questions and cross by Zoom. Seemed very efficient. He spent the entire time in the waiting room, never was allowed to come on. Apparently there was a mix-up. The judge says, we'll reconvene another time, and then she decides she's going to vacate that new hearing and issues a denial, and that's how we got here. Before the court is just a few pages that I thought might be helpful. Let me ask you, are you raising any claims because your client couldn't be cross-examined? You presented his declaration. We did, and so there were things... Whoever would have a claim for that denial of him being cross-examined would be opposing counsel, not you, correct? I'm sorry, say again? If anybody, again, he was able to present his declaration. He might have been in the waiting room for a very long time, but you were not precluded from presenting that declaration. The judge took that in consideration. If anybody could have been harmed, it would have been opposing party, the EPA, who was not able to cross-examine. Well, I think that if it had gone the other way, opposing counsel would be complaining about it, right? So, the winner never complains. The problem here is that the court said, I don't see enough evidence about, for example, economic harm. My client has said, in his declaration, which is substantial, that this has taken his income to zero, near zero. They still have little parts they can sell, and there's spigots and things like that, but near zero. It's a substantially... Counsel, but I think when we go to the injunction factors, I think what was key here, and you have to go to, obviously, we review what went on, but the agency took action, and it has to do with the presence of silver. That's the main issue there. It is. That's the merits of the issue. So, that's... And, again, I think, at least Judge Aferman, there have been other cases, and that's what you have to focus on first when we review these injunctions, or denials of injunctions. Your Honor, I was going to bring it up, since you've asked about being able to present cases, and the court does talk about these things in her opinion, so I'm just pointing out that if my client had had the opportunity to explain that, I thought that there was sufficient evidence in his declaration. You go to zero... But you're saying that my client had sufficient time to explain, but during the injunction proceeding, did you, when the judge made your client wait, and then didn't, he didn't testify, did you make a proffer, say, Judge, my client is here, he needs to testify, I need to do this to present my case? Was that done, or that wasn't done? The court had reset the hearing, and that was going to happen, and then the court vacated that hearing and issued the denial. So that was, we had talked about that, that was going to happen, but let me skip through here because we only have a short time. The main thing here is that the, and you can see it, in November of 22, a dealer that works with Berkey was inspected by EPA folks, and they found the pesticide claims, and then there was a discussion between New Millennium Concepts Limited, NMCL, is a sister corporation, they handle the packaging, so the NMCL and EPA were talking, and they were changing the packaging, and they said, well, EPA said, you're going to have to be an establishment, you're at least a pesticide treated article, and we said, no problem, we got that. So Berkey is showing change, and EPA has acknowledged that, they said, you got your establishment number, that's good, that's not all you need, but that's good, so we're making our way to get it right. And so in January, in the early part of 23, there were no more pesticide claims on the boxes, and the EPA knew that, they knew it, they knew it because they were talking to Jim Shepard about it, they knew it because they were talking to NMCL. They knew there were no claims on the boxes starting in the first quarter of 23. And then without an inspection, EPA's never been to Puerto Rico, except for at their council maybe, but they never certainly inspected any organization in Puerto Rico. And so, and then they issued a SURO, a stop order, to stop all sales, based on the statement that's made on the website, and we'll get to that in just a minute. On this page 6 of the Berkey family tree, this is important because it shows that Berkey was not resting on its laurels when it had this, when it received the stop order. It was working, and we first filed the lawsuit with New Millennium, because New Millennium was the folks that EPA was working with. Of course, the Fifth Circuit disagreed with me that we could file there, and so we're here. But it's not as though we were not doing anything or resting on our laurels. That's an important point. So, if we're going to page 7, and this of course is right out of the SURO. They have the definition of pesticide, substance or mixture of substances, refers to DDT, Roundup, things like that. A pesticide kills a bug, and when we talk about pesticides, a substance, we're not normally talking about a fly swatter. A fly swatter is a pesticidal device. It kills pests. Right. So, the point of this case, I thought, is silver is a pesticide. Silver is a pesticide. There's silver in the product. EPA's position is this product, among other things, kills microbes in the water, and there is silver in the product, so when we have A, silver in the product, B, silver is a pesticide, C, product kills pests, that's enough for us to think you're covered. That's their position. That's their view. Okay. So, focus on that. What is wrong with that position? Step B. Step B. Because it's not that you simply say there's silver there. The rule is that the silver has to be there serving a pesticidal purpose. That's the rule. That's their own rule. That's not our rule. We're not interpreting that. It says that. So, if you look at page 8, again, this is portions of their stop order, the sentence they're focusing on, where they learned that we have this pesticide of silver, it says, yes, silver is used as an antimicrobial to self-sterilize the black burkey elements. Testing was conducted both internally and by analytic services to ensure the silver does not leach into- That would be your client's position. But the EPA's position could also reasonably be that silver in the burkey filters was a pesticide because using silver for antimicrobial purposes indicates the silver is intended necessary for preventing, destroying, repelling, or mitigating viruses, bacteria, et cetera, et cetera. So, you know, you have two competing, you know- I don't see how you get it competing. They don't have any reason to believe that the silver is being used as a pesticide agent. There's no evidence of that. There's no reason to believe that. That's a leap. It is, from the statement they got- Does the water go through the filter? Fluent goes to the filters. That's how it's filtered. Okay. Yes. And then the silver treats the filter. No. The silver simply allows the filter. It combines with the filter so it lasts longer. All of the modern filters have a silver or something similar to a silver thing that, a substance that protects the filter. Your position is that that silver, when you say helps the filter, that's not at all treating the filter for pests? Absolutely not. Absolutely not. And then it- Now, if this was a- You've told that to them? More times than I can count. And what do they say back to you? Sorry? I know. Presence of filter means we give reason to believe. They say reason to believe is anything that we can hang our hat on at all. It doesn't have to be reasonable. It doesn't have to be supportive. Do they inspect or test your machine? They have not. And we have given them our testing to show them that it does not. Have you offered your machine for them to test? Your filter? They have. I assume they have many of our filters. We'd be happy to give them as many filters as they want. But they don't do it that way. What they do is they say, we see a statement, we close- Well, I guess I don't understand the law. Because the law says, maybe you can explain just to me how this works, because the law says for stop orders, whenever any pesticide device is found, and there is reason to believe on the basis of inspections or tests, that it violates the chapter. So what do you understand to be the inspections or tests in this case? I believe when you talk to the EPA, they will say that we have admitted, or we've been outed by this foreign website that we have no control over, who actually gave an accurate statement that we admitted that we have silver, therefore you're done, because silver is known to be a pesticide system. And I would say, Your Honor, that if we had had a three-page website where the statement was not so- So your view, though, is the inspection is the inspection of the website and the labeling? At best. That's the inspection. Right. And it's an inspection that they know, they know is outdated. They know it's outdated. They know that we took the, they knew that, we have, I think oodles is the legal term, of emails back and forth where we say, here's our new packaging, and they say, it's got a pond on it, if it's got a pond on it, that implies that the consumer can use this to purify pond water. That's literally what they, these emails say. Counsel, it sounds like we may be, you're at least into matters that I'm not familiar with from the record here. I was wondering if you could address your due process argument. I understand that the SURRO had immediate effect, and you've argued on appeal that that kind of an effect is, in essence, a deprivation without a prior opportunity for notice and an opportunity to be heard, right? Yes. That makes a lot of sense to me. Where did you make that argument in the district court? I can't put my finger on it because I didn't see that as one of the issues that I was going to talk about today. And, of course, there's two cases, and one of them I talked about even in the Ninth Amendment, the idea that you're going to shut down somebody. The Ninth Amendment? Oh, the Ninth, I don't want to use time on it, but if you're going to take things away from people, then it should be clearly stated in the law, and you shouldn't do it through vague... But the statute says EPA has the authority to issue these orders with immediate effect. I understand you to be making a due process argument. Probably best to skip the Ninth Amendment for... I hear you, but... Okay? Yes. But my question is, where did you raise that issue in the district court? Because that's EPA's response to it, and I didn't see a good response in your reply. I think that that's where I kind of went with our temporary injunction. I'm sorry? With our temporary injunction, I was saying that there's an overreaching reaction to have a temporary injunction whenever we're working with you and we're already shown you that we're doing the work that you want us to do. I don't know that I used the word due process, but I did speak in terms of it's an overreaction that we would say is illegal and unwarranted. They don't have a reason to... But just making a general statement, if you raise a claim, you have to raise it and explain why it violates due process and factually, legally supported, and at least our circuit law says just claims brought just like that, cursorily, it's not enough. Our main claim is the TI should not have been denied, and that's what I'm here to defend. I think that the due process claim... Even if we ignored a due process claim, whatever, you still understand you have enough to get a reversal. That's correct. And that's because one, just so I understand your arguments, they were arbitrary and capricious in deciding that this was a pesticidal device. Correct. Because they had no sufficient proof to make that conclusion. That it's a pesticide. We agree that it's a pesticide. I'm sorry. A pesticide because a device becomes a pesticide when the device has a pesticide in it. So... The standard phrase is it's a treated article. I do want to maintain at least a minute for rebuttal. Okay. So then let's keep your one minute for rebuttal. Thank you, Your Honor. Okay. Thank you. Counsel Farapoli, please introduce yourself on the record to begin. Christopher Anderson for the Environmental Protection Agency. Good morning, Your Honors. May it please the court. I think it's easiest to look at this case from the perspective of what EPA knew at the time it issued the stop sale order. EPA knew that Berkey was manufacturing and distributing water filters for which it made very extreme pesticide claims. Claims that these filters could remove greater than 99% of viruses and bacteria. It knew that those filters contained a substance that is commonly used as an antimicrobial pesticide. And it knew that those filters were not registered as pesticide products under FFRA. Those three facts were sufficient to give EPA reason to believe that the water filters were being sold in violation. So what's the inspection? I mean, it's reason to believe on the basis of inspections or tests. What's the inspection? The inspection is the inspection of James Enterprises and also the import inspection that happened earlier in the year where EPA observed the filters being labeled with the pesticide claims. So it is the labeling that is the inspection? Yes. And that's because FFRA is an intent-based statute, Your Honor. How a product is regulated depends largely on the claims that are made on behalf of that product. And so... But they would say that that, you read that label or that advertising and it says the silver protects the filter and it does not leach into the water. And they say that suggests that the silver is not doing the treating of the water. It's merely protecting the filter. And I guess it seems like it's a pretty big leap without asking to look even at the product or figure out how it works to just say that kind of ambiguous advertising is the basis to stop the company? Well, I think, Your Honor, it is sufficient for two reasons. One, FFRA is a pre-authorization statute. It is illegal to sell any pesticide or product without prior authorization unless it's exempt. So I don't think there's any real dispute here that these are pesticide or products. They contain a pesticide. They are marketed for pesticide or purposes. The question is whether they may be exempt under the treated articles exemption. So from that perspective, the burden is on the manufacturer to demonstrate compliance with the act. With regard to the silver and its use, EPA does understand that that's what Berkey claims. But if I read inspections or tests together as sort of words that Congress decided to bundle together, and you said to me, my inspection of this product is to read a website, I wouldn't think that's what they meant. That doesn't strike me as inspecting or testing the product to figure out how it works. And you just rely on your interpretation of some language that somebody, I guess, puts on a website to then order the company to stop selling because they haven't done this pre-registration. That's a pretty aggressive approach, given the words inspection or test, because test means like actually doing something. I would agree with Your Honor. I think that's what test means. But I do think inspection is broad enough to cover this. And again, that's because the product is not just the article itself, but also the claims that are made on behalf of it under FIFRA and its labeling. All of that together, wholly apart from the issue of the silver, there's a question of whether these devices were misbranded in the way that they were labeled. Even as devices, they would be, under FIFRA regulations, they would have been misbranded. So your position is that basically once they make that statement that follows that train of logic, which I think is the train of logic you used when you stood up here, that once you do that, the burden is on them to do something to say, oh no, it's actually a treated article, which is an exception to this rule, and that's on them, and we don't have to do anything. So your loose language is the inspection, that's good enough for us to move forward. If you want to say something else, that's on you. Is that your position? I think that is broadly our position, Your Honor. But I also think that in this case, EPA did a lot more than that. EPA attempted to work with Berkey and its related companies to see if there were a way, a path forward for marketing these filters lawfully. Why is it about the marketing? Isn't it about the safety of the silver? This is what I don't really understand about this case. Everyone's talking about the labeling, but I thought we were worried about silver hurting people. We are worried about silver hurting people. We're also worried about people using these devices to filter water that may not otherwise be potable, the efficacy of the claims. But for FFRA jurisdiction, it depends on whether the claim being made is pesticide or non-pesticide. So for instance, if these water filters made no pesticide claims whatsoever, if they only claimed to make the water taste better, or even to remove heavy metals, then it would not be regulated under FFRA at all. So that's why the claims matter so much, because of the EPA's jurisdiction to regulate them under FFRA. Even if it had silver in it? Even if it had silver in it. If they didn't claim that it removed pesticides. And the silver's getting in the water? And the silver's, if they are not making claims, the way FFRA works, for better or for worse, the way Congress wrote the statute, EPA can only regulate a product if it claims to kill, mitigate, et cetera, pests. And so if they don't make a claim- I thought it also said if you had actual knowledge. Or if you have actual knowledge, yes. So if there's, I hope, if there's silver in the water and then it's not telling us, but they know it, that's a problem? I would think, no? It presumably is a problem, Your Honor, but it might be that then the filters would have to be regulated under some other statute if they weren't making a pesticidal claim. Does the EPA contend that these devices actually threaten public health? I understand you claim they're illegal without permission, but- EPA hasn't made a judgment in that regard. I think EPA's main concern about public health is that these devices are being marketed for the purpose of- claims have been made for these devices that they can render any water source potable. And those efficacy claims haven't been established. On the question of due process, you told us in your brief, due process is not a problem because this doesn't get enforced until you have notice and an opportunity to be heard. Section 136K, however, says that after receipt of one of these SSURO orders, no person shall sell, use, or remove the pesticide or device described in the order except in accordance with provisions of the order. And this order says stop now. Those seem inconsistent with the position taken in your brief. I understand fines cannot be imposed, but the shutdown seems to be effective without prior notice or opportunity to be heard. So we would say in this case, and this may not be true for every stop sale order that's issued in other cases. But we would say in this case that the prohibition on distribution flows directly from the statute and not from the order, because the statute prohibits the sale of any unregistered pesticide. And all the order does is inform the recipient of EPA's view. That doesn't really solve the problem of notice and opportunity to be heard. We would also say, we think that orders under FIFRA are analogous to unilateral administrative orders that have been upheld under other environmental statutes, where the courts have consistently held that an administrative order, if it is not, until it is enforced, that a due process concern doesn't arise. So for example, the DC Circuit held with regard to circular orders, which unlike FIFRA orders, carry penalties for violation, that there is no due process problem because the recipient of an order can have an opportunity to be heard in any enforcement proceeding on that order. As a matter of due process law, that makes sense if there's actually an urgent threat to public health, right? Yes, but that's not a requirement for a circular unilateral administrative order. What's the circular case you're relying on? It's the General Electric case versus EPA out of the DC Circuit. It's cited in our brief. Okay, thank you. Is the, well, I've got to say, whether this was properly raised in the district court is a separate question, and that's a question that you have raised. Yes. If it were raised, I have serious trouble seeing how, without an actual threat to public health, you can issue such an order with immediate effect. So I think there are two things to bear in mind in that regard. First, FIFRA, and Congress amended FIFRA specifically for the purpose of not requiring EPA to demonstrate threats to public health prior to regulating. FIFRA shifts that burden to the regulated entity to demonstrate that its products are safe. But in addition to that, in FIFRA, unlike under many other environmental statutes that allow for administrative enforcement orders, the stop sale order in this case was immediately subject to pre-enforcement judicial review. Berkey didn't have to wait, did not wait, for EPA to bring an enforcement action, but immediately sought review, and that, we think, also mitigates any due process concern. Well, they can go to court, but the order says effective now, upon receipt. No court can act that quickly, so I don't see how that's an answer. What I'm saying, Your Honor, is other courts have found in analogous statutes that there's no due process concern if the recipient of an administrative order can challenge the lawfulness of the order in an enforcement proceeding. Before it takes effect? And in many of those statutes. Before it takes effect? Before it takes effect. If it can challenge it after the order has been issued. So you have to put yourself in contempt and just, I mean, you have to do something to get yourself fined, and then you can go say this fine is invalid because the underlying order is invalid? That is what every court of appeals that's addressed analogous orders has held. Okay, let me ask you, a little unrelated, but is there any difference between silver that is a registered pesticide product, vis-a-vis silver that is registered for such use, under the treat or article exception at 40 CFR section 152.25 parentheses A? So, yes. Yes, Your Honor. Silver is a substance that is used as a pesticide in many products. For the treated articles exemption to apply, the precise form of silver that is used in Berkey's filters must be registered for the specific purpose of treating water filters to maintain their longevity. And here it's not registered? At the time EPA issued the stop-sale order, EPA didn't know because Berkey and its affiliate companies had not disclosed to EPA what the actual form was. But where does it have to be registered? It's registered with the EPA, correct? It is, but there are many silver products that are registered with the EPA, and EPA didn't know which one. But can't EPA get that information because it's got to be in one of its databases. But it can't know which one Berkey is using unless Berkey tells it. It knows that there are products that are registered for somewhat analogous purposes, but EPA doesn't know which one, and EPA doesn't know that Berkey is, in fact, using one of those products. All EPA knew when it issued the order was that Berkey was using some form of silver in its filters, and Berkey would not share with EPA what the precise product that it was using is. So there's no way for EPA to know. It has to play this guessing game. Which of these products? Couldn't EPA have made a requirement before issuing the order because EPA has that authority? I don't know that EPA has under that sort of administrative subpoena authority under FIPRA. I don't know. Or at least said, if we're not informed exactly which one you're using or for what purpose, then we will issue this order in the next effective two, three days or something. So EPA did repeatedly try to get that information from Berkey and its affiliate companies. Did it do it via letters or? There were informal discussions. I know there were phone calls. There were e-mails. At the time the order was issued, EPA understood Berkey and its affiliate's position to be that they wanted to pursue a path by which they would remove all pesticide claims and so therefore come outside of FIPRA jurisdiction. So at the time the order was issued, EPA was not pursuing that angle as actively. But it was an avenue that had been considered. It was a request for information that had been made to the company. And at the time the order was issued, EPA didn't have that information. Okay. Anything further? If you have no other questions, Your Honor, we would ask that the district court's order be affirmed. Okay. Thank you, sir. One minute for rebuttal. Counsel, please reintroduce yourself on the record. Warren Norad for Appellant Berkey International. Thank you. Yes, we do address due process throughout the appellant's brief in two different places in two different ways. One is the substantively different way that they're going to enforce their rules, which they had the PRN 2000 notice, because they were not enforcing it the way that they decided to start enforcing it. So there's a global due process. Okay, but you said it's raised in appellant's brief. Was it raised below in the district court? Oh. I believe that was the question. Sorry, I missed the question. The answer is I don't know. So I was wondering why that seemed odd. All right, well, then the second question is there's no list of treated, of exempt devices. People have devices, and then they are pesticide devices that are exempt. You don't go somewhere and get them logged. So this idea that, well, it's up to you to prove it. No, nobody proves it. You get challenged by a stop order, and then you have to go get them off your back. I heard a minute ago. Can I have one more minute? 30 seconds to finish this thought and lunchtime for everybody. It was registered. They gave us a manufacturing organization that got an establishment number. Presumably if you get an establishment number, then they know what registered pesticide is being used at that registration. They gave us no opportunity to tell them what it was, what the registered silver was, before they shut us down. Thank you, Your Honor. I appreciate your time.